## COURT OF APPEALS
## DECISION
## DATED AND FILED

## March 24, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No. 2020AP1511** | Cir. Ct. No. 2020ME135 |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS** |
| | **DISTRICT II** |

IN THE MATTER OF THE MENTAL COMMITMENT OF A.A.L.:

WINNEBAGO COUNTY,

PETITIONER-RESPONDENT,

V.

A.A.L.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Winnebago County: TERESA S. BASILIERE, Judge. *Affirmed*.

¶1     REILLY, P.J.[1]  A.A.L. appeals from an order of the circuit court involuntarily committing her under WIS. STAT. ch. 51.[2]  A.A.L. argues that Winnebago County (the County) failed to establish that she is dangerous pursuant to WIS. STAT. § 51.20(1)(a)2.  We conclude that the evidence supports the circuit court's conclusion that A.A.L. is mentally ill, is a proper subject for treatment, and is dangerous.  Accordingly, we affirm.

*Background*

¶2     On March 19, 2020, A.A.L. was taken into custody on an emergency detention under WIS. STAT. ch. 51.  *See* WIS. STAT. § 51.15(5) ("The filing of the statement [of emergency detention] has the same effect as a petition for commitment under [WIS. STAT. §] 51.20.").  A circuit court commissioner held a probable cause hearing on March 24, 2020, finding probable cause to support A.A.L.'s continued detention and the administration of medication and treatment subject to a final hearing.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] The circuit court also entered an order for involuntary medication and treatment, which may be entered following a finding by the circuit court that the subject is not competent to refuse medication or treatment.  *See* WIS. STAT. § 51.61(1)(g)3.  While A.A.L.'s notice of appeal indicates she is appealing from both orders, the medication and treatment order is not a final order for the purposes of appeal.  Moreover, A.A.L. challenges only the commitment order, and she makes no argument that the circuit court erred in concluding that she is not competent to refuse medication.  Accordingly, we will address the order for involuntary medication and treatment no further.

¶3    The following facts are taken from testimony presented at the probable cause hearing.[3]  A.A.L.'s emergency detention resulted from an incident on Oneida Street in downtown Appleton, Wisconsin.  On that day, A.A.L. ran out of gas and was stalled in traffic.  As there was no shoulder to pull over onto, she remained in the right lane of the four-lane street.  The conditions on that day were unfavorable:  it was raining; it was dusk and growing dark; and there was "heavy traffic flow."  A.A.L. did not have her lights or hazard lights on.

¶4    When a community service officer (CSO) arrived to assist her, A.A.L. refused.  Instead, she "attempted to flag down traffic in order to get someone else's attention" by "roll[ing] down her window and … waiving her hands at traffic as it was passing."  The CSO sought to assist A.A.L. for about an hour; each time A.A.L. would "roll up the window when the CSO would talk to her."  A police officer eventually arrived on scene; she testified that A.A.L.'s "demeanor was non-cooperative and relatively aggressive."[4]  A.A.L. declined to identify herself, but she suggested that her refusal to speak to the CSO was a result of her belief that the officers "had deactivated her vehicle with their cell phones and [she] blamed officers for her being stalled in traffic."

¶5    Eventually, A.A.L.'s brother and mother arrived on the scene, and after "lengthy negotiations," were able to convince A.A.L. to exit her vehicle.  Her

---

[3] A.A.L. cited the testimony at her probable cause hearing in her briefs.  While the County observed that "this is an unusual occurrence," it agreed that "providing some details about [A.A.L.'s] detention and history of dangerousness found in the probable cause transcript" is helpful.  We agree and will do so as well.

[4] The officer testified that A.A.L. "exhibited body language, behaviors of someone that would have posed an imminent threat to officers," including "the thousand-yard stare, staring off in the distance, not appearing to look at anything, avoiding eye contact, body shifting movements, [and] reaching around for things inside of the vehicle."

brother testified that when A.A.L. did finally leave her vehicle, she "hit [the door] forcefully" by "kick[ing] it open," and her brother explained that "[i]f [he] would have lost [his] footing, [A.A.L.] would have thrown [him] into traffic."  At that point he reported being "afraid for myself, for my mom, and for my sister"; he did not know "what her reaction would be," as A.A.L. had previously "threatened [their] mom."  A.A.L.'s brother also testified that there had been "multiple occasions" in the preceding sixty to ninety days in which A.A.L. reported being lost or stranded and in need of assistance.  A.A.L. was eventually taken to the hospital.

¶6  At the final commitment hearing, on April 2, 2020, Dr. Marshall Bales, M.D., and Dr. Kevin W. Miller, Ph.D., testified.  Each opined that A.A.L. was mentally ill, a proper subject for treatment, and dangerous.[5]  The circuit court concluded that the County had satisfied the requirements under WIS. STAT. § 51.20(1)(a)1.-2., and it entered a six-month commitment order, including a firearm ban, and an order for involuntary medication and treatment.  A.A.L. appeals.

*Involuntary Commitment and Standard of Review*

¶7  Pursuant to WIS. STAT. § 51.20(1)(a), to involuntarily commit an individual, the county must establish by clear and convincing evidence that the person is (1) mentally ill, (2) a proper subject for treatment, and (3) dangerous.  *See* § 51.20(1)(a)1.-2., (13)(e); ***Langlade County v. D.J.W.***, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277.  Where the challenged order is an initial

---

[5] The testimony of the examiners will be discussed in more detail later in the decision.

commitment, § 51.20(1)(a)2.a.-e. outlines "five different means of demonstrating that a person is 'dangerous.'" *D.J.W.*, 391 Wis. 2d 231, ¶30. If any of those subparagraphs are demonstrated, an individual is "dangerous." *Id.* Whether the county has met its burden under the statute is a mixed question of fact and law. *Id.*, ¶24. "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous," meaning that they are "against the great weight and clear preponderance of the evidence." *Id.* "Whether the facts satisfy the statutory standard is a question of law that we review de novo." *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We now address the issues raised by A.A.L. on appeal.

*Mootness*

¶8      As an initial matter, A.A.L. concedes that the initial commitment order in this case has expired. A.A.L. argues, however, that her appeal is not moot as her commitment carries collateral consequences for her, including the firearms ban, "the stigma associated with an involuntary commitment," and possible travel restrictions.

¶9      We agree that the issue is not moot. Whether an issue is moot is a question of law that we review de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶16, 390 Wis. 2d 50, 937 N.W.2d 901. "An issue is moot when its resolution will have no practical effect on the underlying controversy." *Id.*, ¶19 (citation omitted). Our supreme court has "previously concluded that an expired initial commitment order is moot," but where an individual remains "subject to the lasting collateral consequence of a firearms ban" after the order has expired, the expired commitment order is "not moot." *Id.*, ¶¶22, 25. Here, A.A.L.'s commitment order expired on October 2, 2020. The involuntary commitment

5

order also contained a firearms restriction, which did not terminate with the expiration of the order. *See* WIS. STAT. § 51.20(13)(cv)1m. Therefore, as the County concedes, A.A.L.'s appeal is not moot.

*Procedural Due Process*

¶10     A.A.L. next argues, for the first time on appeal, that she was denied procedural due process, as she "did not receive particularized notice of which standard of dangerousness was alleged." A.A.L. concedes, however, that she did not object to notice in the circuit court, nor did she request clarification or an adjournment of the hearing to properly prepare. She argues that we should still reach this issue on the merits "because the facts with respect to this issue are undisputed and the case presents an issue of law."

¶11     A.A.L. cites to ***Lessard v. Schmidt***, 349 F. Supp. 1078 (E.D. Wis. 1972), *vacated and remanded*, 414 U.S. 473 (1974), *reinstated*, 413 F. Supp. 1318 (E.D. Wis. 1976). There, the court explained that an individual subject to an involuntary commitment must receive notice "'sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded,' and it must set forth the basis for detention with particularity." ***Id.*** at 1092 (citation omitted). The County argues that A.A.L. was not denied procedural due process, as the dangerousness standards that applied at her final hearing "were clearly stated in the supporting court documents and explained with expert testimony." A.A.L. admits in her brief that the reports from the examiners identified the dangerousness standards that the examiners felt were applicable: Bales' report checked the boxes of the third and fourth standard and Miller checked the box for the fifth standard.

6

¶12 We decline to reach the merits of this argument, as A.A.L. has forfeited this argument. "Arguments raised for the first time on appeal are generally deemed forfeited." *State Farm Mut. Auto. Ins. Co. v. Hunt*, 2014 WI App 115, ¶32, 358 Wis. 2d 379, 856 N.W.2d 633 (citation omitted). "The [forfeiture] rule is not merely a technicality or a rule of convenience; it is an essential principle of the orderly administration of justice." *State v. Huebner*, 2000 WI 59, ¶11, 235 Wis. 2d 486, 611 N.W.2d 727. "The purpose of the 'forfeiture' rule is to enable the circuit court to avoid or correct any error with minimal disruption of the judicial process, eliminating the need for appeal." *State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612. A.A.L. has provided no persuasive reason for us to discount the importance of the forfeiture rule and reach the merits on this issue, and we decline to do so.

¶13 Even if we were to set aside the forfeiture issue, A.A.L.'s arguments fail to persuade us that reversal is necessary under any theory. While A.A.L. argues that her hearing "strategy" would have differed depending on the dangerousness standard the County was proceeding under, she does not argue or provide any evidence that defense counsel was ill-prepared or needed more time. *See* WIS. STAT. § 51.20(10)(c) ("The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings that does not affect the substantial rights of either party."). She does make suggestions as to how defense counsel might have prepared differently based on the different standards; yet, she concedes that defense counsel addressed many of those issues during cross-examination at the probable cause and final hearings. A.A.L. does note that if the County were proceeding under the third, fourth, or fifth standard, counsel may have "attempted to locate witnesses to support a claim that A.A.L. had adequate support in the community to assist her with meeting her basic needs."

As A.A.L. admits, however, the examiners' reports indicated the standards the examiners believed were applicable to A.A.L., which included the third, fourth, and fifth standard. Thus, defense counsel was well aware that those standards were at issue. Further, those examiners' reports, the Statement of Emergency Detention by Law Enforcement Officer, and the testimony at the probable cause hearing provided sufficient notice of the basis for her involuntary commitment and all the facts upon which the County planned to proceed at the final hearing. *See Adams County v. D.R.D.*, No. 2020AP1426, unpublished slip op. ¶¶21-22 (WI App Jan. 28, 2021); *Winnebago County v. D.D.A.*, No. 2020AP1351, unpublished slip op. ¶¶9-14 (WI App Dec. 23, 2020).[6]

¶14 A.A.L. also argues that this case presents the same issue our supreme court noted with concern in *D.J.W.*, that where it is unclear which subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. the commitment is based, it creates a "moving target." *D.J.W.*, 391 Wis. 2d 231, ¶36. *D.J.W.* was released after the final hearing in this case. While acknowledging that our supreme court's decision in *D.J.W.*, requiring courts to reference the specific subdivision paragraph of § 51.20(1)(a)2., was prospective, *id.*, ¶59 ("going forward"), she "contends … that due process requires that the *D.J.W.* requirement apply to her case as well." A.A.L. does not support her conclusory assertion with any argument or legal authority. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (noting we can "decline to review issues inadequately briefed"); *see also Associates Fin. Servs. Co. of Wis. v. Brown*, 2002 WI App 300, ¶4 n.3, 258 Wis. 2d 915, 656 N.W.2d 56 (stating we do not consider

---

[6] We cite to these unpublished cases for persuasive authority. *See* WIS. STAT. RULE 809.23(3)(b).

conclusory assertions and undeveloped arguments). Further, we have previously determined that **D.J.W.**'s directive "is inapplicable" where the commitment order predates **D.J.W.**, and, under those circumstances, failure to make the required findings with reference to § 51.20(1)(a)2. "cannot compel reversal." ***Winnebago County v. S.H.***, 2020 WI App 46, ¶14, 393 Wis. 2d 511, 947 N.W.2d 761.

*Sufficiency of the Evidence: Dangerousness*

¶15 Finally, A.A.L. argues that the testimony presented was insufficient to establish that she is dangerous, pursuant to WIS. STAT. § 51.20(1)(a)2.[7] She claims that she was "left to guess which standard of dangerousness the evidence is to be applied to." The circuit court also did not specify under which subparagraph of § 51.20(1)(a)2.a.-e. it was basing its conclusion that the County had satisfied the statute. The County argues that "[t]he third of the five standards of dangerousness applies most directly to A.A.L."

¶16 Consistent with the County's argument, we will address the sufficiency of the evidence as it relates to WIS. STAT. § 51.20(1)(a)2.c. This subparagraph provides that an individual is dangerous when he or she

> [e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. The probability of physical impairment or injury is not substantial under this subd. 2.c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, if the individual may be provided protective placement or protective services under [WIS. STAT.] ch. 55, or, in the case of a

---

[7] A.A.L. does not challenge the finding that she is mentally ill and a proper subject for treatment under WIS. STAT. § 51.20(1)(a)1.

> minor, if the individual is appropriate for services or placement under [WIS. STAT. §] 48.13(4) or (11) or [WIS. STAT. §] 938.13(4). The subject individual's status as a minor does not automatically establish a substantial probability of physical impairment or injury under this subd. 2.c. Food, shelter or other care provided to an individual who is substantially incapable of obtaining the care for himself or herself, by a person other than a treatment facility, does not constitute reasonable provision for the subject individual's protection available in the community under this subd. 2.c.

Sec. 51.20(1)(a)2.c. A.A.L. argues that the testimony presented by Dr. Bales and Dr. Miller at the final hearing was insufficient to establish that there is a "substantial probability of physical impairment or injury." We disagree. Although a close case, we conclude that the evidence presented at the hearing was legally sufficient to meet the third statutory standard for dangerousness.

¶17     On appeal, the County conceded that "the [C]ounty and the trial court could have done more to create a better record in this case. More facts could have been developed through testimony and the court could have supported its findings with more facts." We agree with the County's assessment. Given our supreme court's decision in *D.J.W.*—released after the final hearing in this case—our expectation is that this will be the last year a petitioner in a mental commitment case will need to make such a concession. *See D.J.W.*, 391 Wis. 2d 231, ¶59.[8] These cases should be held to the highest legal standards. As our supreme court explained in *D.J.W.*,

> the purpose of making specific factual findings with reference to a subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. is twofold. First, it provides clarity and

---

[8] We recognize that *Langlade County v. D.J.W.*, 2020 WI 41, ¶59, 391 Wis. 2d 231, 942 N.W.2d 277, specifically dealt with recommitment proceedings, but we see no reason why the court's mandate would not apply for initial commitments as well. The "purpose of making specific factual findings" is equally applicable to initial commitments. *See id.*, ¶¶42-44.

> extra protection to patients regarding the underlying basis for a recommitment. The United States Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). "Freedom from physical restraint is a fundamental right that 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'" *State v. Post*, 197 Wis. 2d 279, 302, 541 N.W.2d 115 (1995) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).
>
> With such an important liberty interest at stake, the accompanying protections should mirror the serious nature of the proceeding. Requiring circuit courts to provide specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based provides increased protection to patients to ensure that recommitments are based on sufficient evidence.

*Id.*, ¶¶42-43 (footnote omitted).

¶18    At the final hearing, both Bales and Miller testified.[9] Bales testified that he met with A.A.L. in person for about thirty or forty minutes and also reviewed all of A.A.L.'s treatment records.[10] He opined, based on this review and his examination of A.A.L., that she has a mental illness: bipolar disorder with psychotic features. When asked for his opinion on whether A.A.L. "is either a danger to herself or others," Bales responded,

> The main dangerousness is that she is so psychotic and catatonic that she is unable to care for her basic needs, but

---

[9] We note that although the County requested that the examiners' reports be entered into evidence, the court never ruled on that request. Since Bales' and Miller's reports were not entered into evidence, we review only their testimony at the hearing. *See D.J.W.*, 391 Wis. 2d 231, ¶7 n.4; *Winnebago County v. S.H.*, 2020 WI App 46, ¶2 n.3, 393 Wis. 2d 511, 947 N.W.2d 761.

[10] Bales reported that A.A.L. recognized him during the examination, and when she mentioned this, Bales remembered he "was her psychiatrist years ago." He noted on cross-examination that he "did treat her many years ago which does not impede [his] ability to be independent."

11

> also she was at such grossly impaired judgment that she was wandering around when her car stalled or something or ran out of gas on Oneida Street and I think that was also dangerous.[11]

Bales testified that he "directly observed her to be in a very disorganized mental state, catatonic, unable to have a detailed coherent conversation, and it was very clear to me that just from that observation that she was in a very psychotic state and would be unable to care for her basic needs. That was a direct observation." He reported that, based on A.A.L.'s treatment records, her "apartment was in shambles" with "[r]otten food around."[12] "The refrigerator was unplugged with rotting food; had not paid her rent; and was quote, an absolute mess, end quote."

¶19    Miller also testified to his opinions regarding A.A.L. Miller was not able to examine A.A.L., as on the day he called, the nurse explained that A.A.L. "was not able to respond intelligently to her request to come to speak with [Miller] on the phone." Miller, like Bales, also testified that A.A.L. has bipolar disorder, type one, with psychosis. He explained that A.A.L. is a proper subject for treatment as her bipolar disorder is "highly treatable," and "when she has been compliant in the past she has responded well." Based solely on a record review,

---

[11] On cross-examination, defense counsel challenged Bales' suggestion that "she was running around on the road," asking him to identify where in the petition it indicated that A.A.L. was doing so and stating that there was no testimony on this at the probable cause hearing. Bales responded, "She was not running but she told me that she got out of her car and was in the rain. She was not running…. [S]he said that she was wandering around and she admitted she was confused and getting rained on." Bales explained that A.A.L. told him this when he "reviewed" the "detention document" with her during the examination. We note that the statement of emergency detention does state that "[o]nce [A.A.L.] exited her vehicle she stood in the rain in the lane of traffic."

[12] During the hearing, defense counsel objected to much of Bales' testimony based on hearsay. At several points, the court required the County to establish a better foundation, but after recognizing that Bales' opinions were based on information he obtained from A.A.L.'s treatment records, the court allowed the testimony. *See* WIS. STAT. § 907.03. A.A.L. does not raise her hearsay objection to Bales' testimony again on appeal.

Miller also opined that A.A.L. had met the standard for dangerousness, specifically as can be inferred from his testimony, the fifth standard. According to Miller,

> One of the issues was her being on Oneida Street in Appleton, and I took a look at the descriptions so there is a possibility of harm to her in the future. As, again, required, we have to look is it a substantial probability in the future, and I felt that her behavior when officers detained her was certainly a risk of harm but not a substantial risk of harm in the future based upon her mental illness.
>
> So for me what I placed weight on was very clear documentation that she has received mental health treatment beginning in or about 2011 for bipolar disorder; that she stopped treatment regularly at various times; and when she did, she developed paranoia and manic stage; thus, that she was not able to, in this case, navigate a vehicle and then get assistance properly when she ran out of gas.
>
> She had not been able to pay her rent. She had lost her job. She had rotten food, per collateral records, in her apartment, and family had reported that she had periods of violence over the past year so all of that collectively suggested she had lost volitional control over her thoughts, moods, and behaviors. She had the risk of benefits and alternatives of medication explained to her but she refused; and, therefore, to prevent further deterioration of her condition and get her back to a baseline mental state, she met the standard for dangerousness.

¶20    Based upon the above evidence, the circuit court found that the County had established the dangerousness element by clear, satisfactory, and convincing evidence. The court observed that the finding of a mental illness had essentially been "stipulated to." As to dangerousness, the court found that "the standard of dangerousness is met":

> [T]he impairment here is one in which she constitutes a substantial risk of harm to herself; specifically, the Court took into consideration the apartment being in shambles, there being rotted food, wandering after running out of gas, and her being catatonic and unable to articulate her needs.

13

¶21 We see no error. The fact that A.A.L.'s car ran out of gas or stalled on the side of a busy street in downtown Appleton is not in dispute. The circuit court concluded that A.A.L. was then "wandering" around in the rain because she was "catatonic" and "unable to articulate her needs." These findings by the court are supported by the evidence and a weighing of the credibility of the witnesses. This is also not the first time in the preceding months that A.A.L. needed assistance while driving in her vehicle. As the examiners put it, A.A.L.'s judgment was "grossly impaired." She "developed paranoia and manic stage" as a result of stopping treatment, and "she was not able to, in this case, navigate a vehicle and then get assistance properly when she ran out of gas." There is no question this was a dangerous situation. There is also no question that A.A.L.'s behavior on that day, as a result of her mental illness, could have easily resulted in injury to A.A.L., those who were attempting to assist her, or other motorists on the road.

¶22 Additionally, when Bales met with A.A.L. she was "in a very disorganized mental state, catatonic, unable to have a detailed coherent conversation," and in a "very psychotic state," which he opined meant that she "would be unable to care for her basic needs." As the court noted, her apartment was in "shambles" and there was "rotting food" as a result of her refrigerator being unplugged. She had lost her job and was unable the pay her rent. This pattern of behavior—or acts or omissions—all indicate an inability to "care for her basic needs," which under certain innumerable circumstances, as demonstrated by the Oneida Street incident, would create "a substantial probability of physical impairment or injury" to herself or others.

¶23 While, as stated previously, we agree that the County and the court could and should have done more to develop a record in this case—at a minimum

14

by entering the examination reports into evidence absent an objection from A.A.L.—we conclude that the evidence presented at the final hearing was sufficient to establish "impaired judgment" such "that there is a substantial probably of physical impairment or injury" to A.A.L. or others.[13]  *See* WIS. STAT. § 51.20(1)(a)2.c.  Accordingly, A.A.L. is mentally ill, a proper subject for treatment, and dangerous as defined under § 51.20(1)(a)2.c.  We affirm the circuit court's commitment order.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[13] We note that A.A.L. does not make an argument about the second part of WIS. STAT. § 51.20(1)(a)2.c., which notes that the probability of physical impairment or injury under that statute is not substantial "if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services."  We acknowledge that the County must prove all the required facts by clear and convincing evidence, and we note that the circuit court did not make any findings on this issue.  Regardless, whether the facts satisfy the statutory standard for dangerousness is a question of law that we review independently.

In this case, we conclude the County presented sufficient facts to establish that it was not reasonably probable that A.A.L. would avail herself of services in the community.  For example, at the final hearing, Bales testified that A.A.L. had "been off of her medication for a year" and was not able to "reasonably or rationally discuss [the medication] at all."  Miller testified that A.A.L. "had the risk [and] benefits and alternatives of medication explained to her but she refused," and was "refusing treatment after the staff did speak with her about treatment options."  Therefore, on this record, the County met its burden to prove that it was not reasonably probable that A.A.L. would avail herself of services in the community because she went off her medication, and even after the benefits were explained to her, she refused treatment.